# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1395 | **DATE** | 12/14/2001 |
| **CASE TITLE** | AMERICAN NATL.'BANK,et al vs. TOWN OF CICERO,et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER MEMORANDUM OPINION AND ORDER: the Court grants in part and denies in part defendants' Motion to Dismiss [7-1]. Only plaintiffs' section 1983 claim based upon equal protection remains.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | number of notices | |
| | No notices required. | | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | DEC 17 2001 date docketed | |
| ✓ | Docketing to mail notices. | | 26 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| | | date mailed notice | |
| TBK | courtroom deputy's initials | | |
| | | 01 DEC 14 PM 4: 09 | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

AMERICAN NATIONAL BANK and TRUST )
COMPANY OF CHICAGO, as successor )
Trustee to Comerica Bank, u/t/a dated January )
3, 1975, EDITH KEBLERIS, an individual and )
beneficiary of AMERICAN NATIONAL )
BANK and TRUST COMPANY OF )
CHICAGO, as successor trustee to Comerica )
Bank, u/t/a dated January 3, 1975, SCOTT M. )
KEBLERIS, an individual, and ANTHONY M. )
KEBLERIS, an individual, )
                                 )      01 C 1395
                                 )      Judge Ronald Guzmán
                                 )
                Plaintiffs, )
                                 )
             vs. )
                                 )
TOWN OF CICERO and ANTHONY J. )
ACCARDO, individually and in his official )
capacity, )
                                 )
                Defendants. )

**DOCKETED**

**DEC 1 7 2001**

## MEMORANDUM OPINION AND ORDER

Plaintiffs have brought claims under 28 U.S.C. §§ 1983 and 1985(3) ("section 1983 and 1985") against defendants, the Town of Cicero and Anthony Accardo, both individually and in his official capacity as the Building Commissioner of the Town of Cicero. Plaintiffs also bring a number of supplemental state law claims under 28 U.S.C. § 1367. Defendants have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). For the foregoing reasons, defendants' Motion to Dismiss is granted in part and denied in part.



1

## Facts

The Hawthorne Inn ("the Hawthorne") in Cicero, Illinois was once the headquarters to Al Capone, Public Enemy Number One and one of Chicago's most infamous criminals. In 1926, the O'Banion brothers, leaders of the Irish North Side Gang, sent a machine-gun motorcade to the Hawthorne to wipe Capone out. Though they sprayed over a thousand bullets into the hotel, Capone escaped unscathed. Seventy years later, the Hawthorne was once again cloaked in infamy.

The Hawthorne had been owned and operated by the Kebleris family as both a hotel and rooming house without incident since 1958. (Compl. ¶ 9.) The Hawthorne also had a grandfathered zoning provision allowing for the operation of a tavern within it. (*Id.* ¶ 10.) Edith Kebleris became the owner of the Hawthorne in 1976 when her husband Raymond passed away. (*Id.*) Since 1975, Edith annually applied for and received a business license under § 19-83 of Cicero's Code of Ordinance. Although she never actually received a physical license from Cicero, she was never told that the Hawthorne could not operate without the actual license. (*Id.*)

The Hawthorne is located near both Sportsman's Park and Hawthorne Park Race Track ("racetracks"). (*Id.* ¶ 15.) After the Illinois Racing Board ("Racing Board") demanded that Cicero provide more parking around the racetracks, defendants, in order to comply, conspired early in 1998 to acquire the Hawthorne and other parcels of land surrounding the racetracks. (*Id.*)

First, members of the Cicero Fire Department made an unannounced fire inspection of the Hawthorne on September 3, 1998, but no significant problems were discovered and no code violations or tickets were issued. (*Id.*) Then in October 1998,

Cicero's Building Department, headed by Mr. Accardo, decided to close down the Hawthorne to help meet the Racing Board's mandate. (*Id.* ¶¶ 15, 21.) On October 28, 1998, Ms. Chlada, a representative of Cicero, phoned Edith to tell her that "she would be closed up tomorrow." (*Id.* ¶ 21.) When Edith asked why, Ms. Chlada refused to provide a reason and hung up on her. (*Id.*) The next day several employees from Cicero's Building and Health Departments visited the Hawthorne to conduct an inspection. (*Id.* ¶ 22.) Although the Building Department had conducted many similar inspections from 1975 though October 1998 with no violations ever being issued, Edith received violations from this latest inspection for operating the Hawthorne without a license and for failing to have an operating water closet, lavatory basement, bathtub, or shower connected in every unit. (*Id.* ¶ 22.)

Although Edith informed the inspectors that she had operated the Hawthorne in the same manner since 1975 and that the Hawthorne had a grandfathered lease permitting the conditions now found to be in violation, she was informed by the inspectors that "they could make their own rules." (*Id.* ¶ 23.) Later that day, city officials obtained a court order and closed the Hawthorne. (*Id.* ¶ 24.) No hearing was held regarding the decision to shut down the Hawthorne and tenants were forced to wait several days before they were allowed to enter their rooms to collect their things. (*Id.* ¶ 25, 32.) Edith was also prevented from curing any of the violations found by the city employees. (*Id.* ¶ 34.)

Without any alternative, Edith decided to sell the Hawthorne. (*Id.* ¶ 27.) In 1996, she had attempted to sell the Hawthorne, but the buyer backed out after Cicero passed a "new ordinance" requiring the installation of a full washroom in each room. (*Id.* ¶¶ 30, 31.) In 1999, a second prospective buyer wanted to purchase the Hawthorne and

bring it up to code, but Cicero refused to give him the information necessary to do so. (*Id.* ¶ 28.) Thus, through the rezoning of the property and the revocation of the grandfather lease, Edith was unable to sell the Hawthorne. (*Id.* ¶¶ 27, 30.)

Edith was then forced to sell the Hawthorne to the town of Cicero, "the only game in town," at a price substantially lower than the appraised value of the property.[1] (*Id.* ¶ 37.) On March 1, 2000, she agreed to sell the Hawthorne to Cicero for $200,000.00. (*Id.* ¶ 38.) Cicero then turned up the heat by threatening to initiate condemnation proceedings if a "quick sale" was not consummated. (*Id.* ¶ 38.) As a result of this quick sale, Edith was forced to buy out the remaining lease for the tavern located in the Hawthorne for $12,500.00. (*Id.*) Also, as the final piece of the forced sale, Cicero demanded that Edith's sons sell their property located around the racetracks. (*Id.* ¶ 40.)

On February 28, 2001, plaintiffs filed a six-count Complaint. Count I is a section 1983 claim against both defendants for violating plaintiffs' procedural due process, substantive due process, and equal protection rights, privileges, and immunities secured under the Fifth and Fourteenth Amendments. (*Id.* ¶ 47.) Count II is a section 1985 claim against both defendants for conspiring to discriminate against plaintiffs. (*Id.* ¶ 49.) The remaining counts are state law claims against both defendants, including tortious interference with prospective economic advantage, tortious interference with contractual

---

[1] In September of 1995, Spectrum Appraisals determined that the property was worth $310,000.00, but plaintiffs contend that this appraisal was low. (*Id.* ¶ 12.) Cicero refused to pay the full appraisal value for the blatantly ironic reason that the Hawthorne was not operational. (*Id.* ¶ 37.)

relations, common law conspiracy, and a violation of equal protection and due process under the Illinois Constitution.

**Discussion**

On a motion to dismiss under Rule 12(b)(6), all of the well-pleaded factual allegations are accepted as true and all reasonable inferences are drawn in the light most favorable to the plaintiff. *Wilczynski v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 401 (7th Cir. 1996). Allegations in the complaint are to be construed liberally. *Jones v. General Elec. Co.*, 87 F.3d 209, 211 (7th Cir. 1996). The motion should not be granted unless it appears beyond doubt that the plaintiff cannot prove any set of facts that would support her claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957).

## I. Statute of Limitations

Defendants first argue in their Motion to Dismiss that plaintiffs' federal claims are barred by the statute of limitations. (Mot. Dismiss at 1.) In *Wilson v. Garcia*, the Supreme Court held that actions under section 1983 should be characterized as personal injury claims, and, as such, were governed by the personal injury statute of limitations in the state where the alleged injury occurred. 471 U.S. 261, 279 (1985). In Illinois, section 1983 or 1985 claims are governed by a two-year limitations period. *Gosnell v. City of Troy, Ill.*, 59 F.3d 654, 656 (7th Cir. 1995) (applying a two-year statute of limitations to a section 1983 claim); *Kness v. Grimm*, 761 F. Supp. 513, 519 (N.D. Ill. 1990) (applying a two-year statute of limitations to a section 1985(3) claim). Federal law, however, determines the accrual of those claims. *Wilson v. Giesen*, 956 F.2d 738, 740 (7th Cir. 1992). The statute of limitations begins to run upon discovery of the alleged injury by

the plaintiff. *Link v. Village of Wadsworth,* No. 95 C 7075, 1996 U.S. Dist. LEXIS 5172, at *14 (N.D. Ill. April 17, 1996); *Goodhand v. United States,* 40 F.3d 209, 212 (7th Cir. 1994).

Defendants contend that plaintiffs' injury occurred on October 29, 1998, when Cicero officials closed down the Hawthorne. (Mot. Dismiss at 2.) Because the Complaint was not filed until February 28, 2001, defendants argue that plaintiffs' federal claims are time-barred. (*Id.*) Plaintiffs rebut this by arguing that the "continuing violation" doctrine applies and thus their claims are not time-barred. (Pls.' Resp. Mot. Dismiss at 8.) According to plaintiffs, the conspiracy began with the passing of the "new ordinance" in 1996 without any notice being given to them, and continued up to the sale of the Hawthorne at a substantially reduced price on March 1, 2000, "all in furtherance of Defendants' scheme to acquire the properties for their own pecuniary gain." (*Id.*) Thus, the first issue is whether the "continuing violation" doctrine applies to plaintiffs' claims.

Normally, section 1983 claims accrue when the plaintiff knows or should know that her constitutional rights have been violated. *Giesen,* 956 F.2d at 740 (applying the continuing violation doctrine to section 1983 and 1985(3) claims); *Diaz v. Shallbetter,* 984 F.2d 850, 855 (7th Cir. 1977). The continuing violation doctrine is an exception that allows a plaintiff to get relief for time-barred acts by linking them with an act that is within the limitations period. *Selan v. Kiley,* 969 F.2d 560, 564 (7th Cir. 1992). However, the doctrine is not suited to cases where the harm is definite and discoverable, and nothing prevented the plaintiff from coming forward to seek redress. *Giesen,* 956 F.2d at 743. "The exception as to continuing, ongoing acts does not apply where the alleged tortious acts ... caused direct damages that occurred at a certain point in time ...

resulting in immediate and direct injury ... with consequential effects." *Id.* (quoting S. Speiser, C. Krause & A. Gans, *The American Law of Torts*, § 5:27 at 890 (1983)).

The continuing violation doctrine allows a plaintiff to bring her case all at once when it would have been unreasonable to require her to sue separately on each violation. *Malhotra v. Cotter & Co.*, 885 F.2d 1305, 1310 (7th Cir. 1989). In a setting of alleged discrimination, ordinarily this will be because the plaintiff had no reason to believe she was a victim of discrimination until a series of adverse actions established a visible pattern of discriminatory treatment. *Malhotra*, 885 F.2d at 1310.

There are four main acts complained of by plaintiffs. The first was the prospective sale to Mr. Jones in 1996, which was aborted after the Town of Cicero passed a "new ordinance" requiring rooming houses like the Hawthorne to install full washrooms in each room. (Compl. ¶¶ 30, 32.) The second act was the alleged summary closing of the Hawthorne in 1998. (*Id.* ¶¶ 23, 24, 25.) The third act was the alleged aborted sale to Mr. Diaz in 1999 after Cicero refused to provide him with information necessary to bring the Hawthorne up to code. (*Id.* ¶ 28.) The final act was the alleged "forced sale" of the Hawthorne to defendants under the threat of condemnation proceedings if plaintiffs did not sell quickly. (*Id.* ¶¶ 36, 39.) Because plaintiffs knew or should have known that their constitutional rights were violated when town officials shut down the Hawthorne, and because they do not allege that anything prevented them from coming forward with their claims at that time, the continuing violation doctrine does not apply and their claims based upon that incident are now time-barred. Furthermore, plaintiffs' claim based upon the aborted sale to Mr. Jones in 1996 is also barred. Plaintiffs allege that when defendants met with Edith to discuss the "new ordinance" in

1996, they were told that the Hawthorne did not have a grandfathered lease. (*Id.* ¶ 31.) While it might not have been clear to plaintiffs at that point that their constitutional rights were being violated, it should have been made clear to them when the Hawthorne was closed down despite the grandfather lease in October 1998.

Plaintiffs rely on *Kielczynski v. Village of LaGrange, Ill.*, 19 F. Supp. 2d 877, 881 (N.D. Ill. 1998), and *Wolf v. Chicago Heights*, 828 F. Supp 520, 523 (N.D. Ill. 1993), to support their claim that the continuing violation doctrine applies to their federal claims. (Pls.' Resp. Mot. Dismiss at 8.)

In *Kielczynski*, the plaintiff was a policewoman for the Village of LaGrange. 19 F. Supp. 2d at 879. From the time she joined the force in 1981 to the time she filed her complaint on November 21, 1997, her fellow officers subjected her to numerous acts of sexual discrimination and retaliation, including asking her to do demeaning tasks that male employees were not asked to do, refusing to provide necessary back up to protect her while on duty, reviewing her performance more critically than male officers were reviewed, and taking actions to ensure that she did not get promoted. *Id.* In November 1997, she finally had enough and sued under Title VII and section 1983. *Id.* at 880. Though Title VII has a 300-day statute of limitations and many of the incidents of sexual discrimination occurred outside that time limit, the court found the continuing violation doctrine applicable and ruled that none of the incidents were time-barred. *Id.* at 882.

The *Kielczynski* court found it appropriate to apply the continuing violation doctrine to the plaintiff's claims because it would have been unreasonable for her to sue separately on each incident of sexual discrimination. *Id.* at 881. The defendants followed a practice of covert discrimination such that it was not reasonable for her to

believe she was a victim of discrimination until a visible pattern of discriminatory treatment became clear. *Id.* at 882.

Conversely, in the instant case a reasonable person in plaintiffs' position would or should have known that his or her constitutional rights were violated when town officials shut down the Hawthorne in October 1998. First, in September 1998, the Cicero Fire Department visited the Hawthorne unannounced and unbeknownst to plaintiffs to conduct an "inspection." (Compl. ¶ 14.) Then, the day before the Hawthorne was closed down, plaintiffs received a "suspicious phone call" from a representative of Cicero telling them that they would be shut down. (*Id.* ¶ 21.) When Edith asked for a reason, the representative hung up on her. (*Id.*) On October 29, 1998, town officials followed through on this threat after an inspection revealed two violations, even though the Hawthorne had never before received any violations and had a grandfathered lease allowing for the presence of the conditions found in violation. (*Id.* ¶¶ 22, 23.) When plaintiffs tried to explain to the officials that the Hawthorne had a grandfathered lease, the town officials told them "they could make their own rules." (*Id.* ¶ 23.) The officials then forced all the tenants out of the building and locked the doors. (*Id.* ¶ 24.) Plaintiffs were neither informed of any change in the zoning laws nor informed that their grandfather lease would be revoked. (*Id.* ¶ 32.)[2] No hearing was ever held regarding defendants' decision to close the Hawthorne. (*Id.*)

---

[2] Plaintiffs allege that in 1996, a Mr. Jones attempted to buy the Hawthorne, but was told that a new ordinance was being passed requiring the installation of a full washroom in each room of a rooming house. (Compl. ¶ 30.) Plaintiffs further allege that Edith met with Mr. Accardo, who explained this new ordinance to her. (*Id.* ¶ 31.)

While defendants may have passed the new zoning ordinance covertly without plaintiffs' knowledge, it can hardly be argued that a reasonable person in plaintiffs' position would not have known that his or her constitutional rights had been violated when the town officials summarily closed down the Hawthorne and locked out the tenants, telling plaintiffs that "they make their own rules." Unlike the plaintiff in *Kielczynski*, the discriminatory treatment by defendants was or should have been evident to plaintiffs.

Plaintiffs next rely on *Wolf v. City of Chicago Heights*, 828 F. Supp. 520 (N.D. Ill. 1993). In *Wolf*, the defendants were Chicago Heights' city employees, including the mayor, city administrator, superintendent of the building department, housing code officer, and two building inspectors. 828 F. Supp. at 521. The plaintiff alleged that in the 1980s, the defendants believed that too many African-Americans and Mexican-Americans were moving into the west side of their city, so they devised a scheme to keep them out. *Id.* at 522. To accomplish this goal, the defendants allegedly falsified inspection records concerning several of the buildings on the west side and ordered those tenants who lived there to leave. *Id.* The defendants also allegedly paid individuals to vandalize, steal from, and set fire to several of the buildings. *Id.* The plaintiff, who owned one of the buildings allegedly targeted by the defendants, sued under sections 1981, 1982, 1983, 1985, and the Fair Housing Act. *Id.* The defendants sought to dismiss the complaint on the grounds that the events complained of were time-barred. *Id.*

The *Wolf* court denied the motion to dismiss because it found that all of the alleged violations occurred within the two-year statute of limitations. *Id.* at 523. ("First, the December 24, 1990 declaration of the property's non-inhabitability occurred within

the two-year limitations period.") The court also noted, in the alternative, that even if the declaration of non-habitability had occurred outside the statutory limit, the violation by the defendants was continuous after the city issued that notice. *Id.* The court stated that the statute of limitations should only run when the plaintiff knew or reasonably should have known of the facts supporting his discrimination charge. *Id.* "Defendants never stated publicly that they were trying to exclude African-Americans and Mexicans from the area where the property was located, or that they were conspiring to demolish the [plaintiff's] property, and there is no suggestion that plaintiff knew or should have known about defendants' alleged scheme . . .." *Id.* It is this last aspect of the holding in *Wolf* that undermines Plaintiffs' argument.

First, in contrast with *Wolf*, the aborted sale to Mr. Jones in 1996 and the closing of the Hawthorne did not occur within the two-year statute of limitations. As the *Wolf* court noted, all of the alleged violations in that case occurred within the two-year limitations period. Second, unlike the plaintiff in *Wolf*, plaintiffs either knew or should have reasonably known that their constitutional rights were violated when the Hawthorne was summarily closed.

This case is factually similar to *Kelly v. Collins*, 4 F.3d 509, 510 (7th Cir. 1993),[3] in which the Seventh Circuit found that the plaintiffs' claims were time-barred. In *Kelly*, Chicago police officers conspired to close down a bar owned by the plaintiffs on the city's north side by falsely accusing the plaintiffs of selling narcotics from the bar. *Id.* The plaintiffs were indicted on May 11, 1988, and the City of Chicago revoked the

---

[3] Though the appeal in *Kelly* was from a motion for summary judgment, all facts in this Opinion are taken solely from the face of the Complaint.

bar's liquor license on September 1, 1988. *Id.* The plaintiffs appealed this revocation, but the Circuit Court of Cook County denied the appeal on April 19, 1989. *Id.* The bar was closed by the city on July 27, 1989. *Id.* The plaintiffs filed their complaint on November 15, 1990. *Id*

The plaintiffs argued that the statute of limitations did not begin to accrue until all judicial remedies were exhausted and until the bar was closed in July 1989, which would mean that the plaintiffs' complaint was timely. *Id.* at 511. The defendants argued that the statute began to run when the liquor license was revoked by the city in September 1988. *Id.* The court held that the statute began to accrue when the plaintiffs knew or should have known that their constitutional rights had been violated. *Id.* Since the plaintiffs claimed that they were injured when the license was revoked, the court held that the statute began to accrue in September 1988 when the city revoked their liquor license. *Id.* The court noted that the proper focus in determining when the statute begins to accrue is "the time of the discriminatory act, not the point at which the consequences of the act became painful." *Id.* at 512 (quoting *Chardon v. Fernandez,* 454 U.S. 6, 8 (1981)). Thus, the proper focus in this case is (1) when did the discriminatory act occur and (2) when should plaintiffs have known that their constitutional rights were violated.

There is no question that the discriminatory act occurred in October 1998 when the Hawthorne was closed down. Plaintiffs began to feel the painful consequences of this act immediately when they could no longer operate the Hawthorne as a hotel and rooming house. As stated earlier, plaintiffs should have known at that point that their constitutional rights were violated. Like the plaintiffs in *Kelly,* plaintiffs were injured when the local government summarily shut them down.

Arguably, plaintiffs' injuries occurred when the Town of Cicero passed the "new ordinance" in 1996 because that was the first step in the alleged conspiracy to take their property. In *Link v. Village of Wadsworth*, No. 95 C 7075, 1996 U.S. Dist. LEXIS 5172, at *4 (N.D. Ill. Apr. 17, 1996), the plaintiff complained that a village zoning ordinance arbitrarily allowed other landowners greater privileges than he enjoyed and alleged a violation of equal protection. The plaintiff further argued that the zoning ordinance constituted a continuous taking which affected the value of his property from the day the ordinance was passed up to the day he filed his complaint. *Id.* No 95 C 7075, 1996 U.S. Dist. LEXIS 5172, at *5. Thus, the plaintiff argued that because of this continuing violation, the statute of limitations was tolled for his section 1983 claim against the Village of Wadsworth. *Id.* The court rejected the plaintiff's contention and held that the injury to the plaintiff occurred when the ordinance was passed because "[P]laintiff's theory would eliminate the statute of limitations in zoning cases." *Id.* at 15-16.

In this case, the "new ordinance" requiring full washrooms in each room was passed sometime in 1996. (Compl. ¶¶ 30, 31.) Since plaintiffs allegedly had a grandfathered lease allowing for the conditions of the Hawthorne to remain the same, the alleged discriminatory ordinance did not injure plaintiffs when it was passed in 1996, even though they were told at that time that "there was no grandfather provision for the property itself." (Compl. ¶ 31.) Plaintiffs' injury occurred when defendants enforced the ordinance in October 1998 despite the Hawthorne's alleged grandfather lease. When defendants told plaintiffs that "they could make their own rules" regardless of any grandfather lease, and then shut down the Hawthorne, plaintiffs should have known their constitutional rights were violated.

Thus, the Court finds that the aborted sale to Mr. Jones in 1996 allegedly caused by the passing of the "new ordinance" and the closing of the Hawthorne in 1998 occurred outside the statute of limitations. However, both the aborted sale to Mr. Diaz sometime in 1999 and the "forced sale" in March 2000 are within the time period.[4] Thus, the next issue is whether plaintiffs have stated any claims based upon those two incidents.[5]

## II.     Section 1983 Claim

In any section 1983 action the plaintiff must prove two essential elements: (1) the conduct complained of must have been committed by a person acting under the color of law and (2) that the conduct deprived a person of rights, privileges, or immunities secured by the Constitution or the laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535 (1981).

### A. Municipal Liability of the Town of Cicero

Defendants claim that plaintiffs' have not properly alleged municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because they cite

---

[4] It is unclear when exactly in 1999 Mr. Diaz attempted to buy the Hawthorne, but was thwarted by defendants. While discovery may reveal that this occurred before February 28, 1999, thus making the act outside the statute of limitations, because all inferences at this stage are to be made in a light most favorable to plaintiffs, the Court will assume the act is not time-barred.

[5] It should be noted that plaintiffs do not allege and have disavowed any takings claim in this case. (Pls.' Resp. Mot. Dismiss at 2.) Thus, defendants' arguments based upon a failure to state a takings claim is moot. (Mot. Dismiss at 8.) Similarly, defendants' argument that plaintiffs have merely stated a "garden variety" zoning dispute is also rendered moot because both the passing of the zoning ordinance and the enforcement of that zoning ordinance are time-barred acts. (*Id.* at 8.) Also, defendants argue that plaintiffs have waived their rights or are estopped from bringing their claims. (Mot. Dismiss at 5, 7.) Since defendants have not cited any law in support of their positions, they have not properly raised these issues.

14

no official policy of the Town of Cicero that caused their alleged injuries. (Mot. Dismiss at 2.) Plaintiffs argue that they have properly alleged municipal liability of the Town of Cicero based upon a custom of acquiescence by the Town of Cicero in the conspiracy to acquire their property in violation of their rights. (Pls.' Resp. Mot. Dismiss at 6.)

The *Monell* Court held that a municipality cannot be held liable on a respondeat superior theory solely because it employs a tortfeasor. 436 U.S. at 691. For a plaintiff to hold a municipality financially responsible for her injury, she must allege and prove that her injuries were caused pursuant to some government policy or custom. *Id.* at 694. The Supreme Court has made it very clear that there is no heightened pleading standard in civil rights cases alleging section 1983 municipal liability. *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). Since plaintiffs have not alleged that they were injured due to a municipal policy, the issue becomes whether they have properly alleged a municipal custom as the cause of their injuries.

Section 1983 authorizes a suit for constitutional deprivations caused by governmental custom even though that custom has not received formal approval through the body's official decision-making channels. *Monell*, 436 U.S. at 690-91. An unconstitutional policy or custom could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). At the other end of the spectrum, an unjustified shooting by a police officer cannot, without more, be thought to result from official policy. *Id.* at 123. This requirement was intended to prevent the imposition of municipal liability under circumstances where no wrong could be ascribed

to municipal decision-makers. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 821 (1985). Liability should not be imposed upon a municipality just because it hired one bad apple. *Id.* at 822. A governmental entity is liable under section 1983 only when it is the "moving force" behind the deprivation. *Polk County v. Dodson*, 454 U.S. 312, 326 (1981). A custom of a municipality may be established by proof of knowledge and acquiescence. *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (7th Cir. 1989).

Plaintiffs have properly alleged municipal liability of the Town of Cicero under the standards set forth in *Monell* and its progeny. They allege that the Town of Cicero and its employees conspired to take their property to meet the Racing Board's demand for additional parking around the racetracks. (Compl. ¶ 15.) In furtherance of this conspiracy, plaintiffs allege that Cicero employees undermined an attempted sale of the Hawthorne to Mr. Diaz in 1999 by refusing to provide him with the information necessary to bring the Hawthorne up to code. (*Id.* ¶ 28.) Finally, plaintiffs allege that Cicero officials forced them to sell the Hawthorne quickly at a reduced price or face condemnation proceedings. (*Id.* ¶ 38.) In this case, plaintiffs have alleged that the Town of Cicero was the driving force behind the alleged conspiracy. Furthermore, they allege that the conspiracy was committed not only through the joint effort of numerous Cicero officials, but with the Town of Cicero's acquiescence and blessing as well. Thus, they have properly pled municipal liability under *Monell*. [6]

_____

[6] It should be noted that plaintiffs have requested punitive damages in their prayer for relief. (Compl. ¶ 48 (C)). Punitive damages are not available under section 1983 from a municipality, but are available in a suit against an official personally. *Kentucky v. Graham*, 473 U.S. 159, 167 n.13 (1984).

## B. State Action of Mr. Accardo

Defendants next argue that plaintiffs' Complaint fails to state a cause of action against Mr. Accardo because there are no allegations demonstrating that he played any role in causing any of plaintiffs' alleged injuries. (Mot. Dismiss at 3.) Plaintiffs have sued Mr. Accardo in both his individual and official capacities. (Compl. ¶ 5.)

For plaintiffs to establish personal liability in a section 1983 cause of action, they must allege that an official, namely Anthony Accardo, caused the deprivation of a federal right while acting under color of state law. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1984). To establish official liability, a plaintiff must show that the municipality for which the official works was the moving force behind the deprivation. *Polk County*, 454 U.S. at 326. State employment is generally sufficient to render the official a state actor. *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 935 n.18 (1981). The party charged with the deprivation must be a person who may fairly be said to be a state actor. *Lugar*, 457 U.S. at 937.

The notice pleading system of the Federal Rules of Civil Procedure only requires a "short and plain statement of the claim" so as to fairly apprise an opponent of what he has done wrong. *Conley v. Gibson*, 355 U.S. 41, 47 (1957) (citing Federal Rule of Civil Procedure 8(a)). "The claimant need not set out in detail the facts upon which he bases his claim." *Conley*, 355 U.S. at 47. The claimant need not allege all, or any facts logically entailed by the claim . . . he does not have to plead evidence, and the complaint need not set forth a complete picture of the alleged wrongdoing. *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998) (quoting *American Nurses v. Illinois*, 783 F.2d 16, 727 (7th Cir. 1986).

Plaintiffs have not alleged which specific Cicero officials or departments hindered the sale to Mr. Diaz or forced the sale of the Hawthorne. However, Mr. Accardo was the head of the Building Department, which allegedly played a role in the conspiracy to take plaintiffs property. (Compl. ¶¶ 5, 22.) As stated earlier, plaintiffs have properly alleged that Cicero, for which Mr. Accardo is the head of the Building Department, was the driving force behind plaintiffs' injuries. Viewing plaintiffs' allegations in the light most favorable to them, they might be able to prove that Mr. Accardo was indeed part of the conspiracy while acting under color of state law and that is all that is needed to survive a Rule 12(b)(6) motion. *See Pickrel v. City of Springfield*, 45 F.3d 1115, 1119 (7th Cir. 1995).

Thus, plaintiffs have properly alleged defendants acted under color of law. The next question is whether plaintiffs have stated any claims based upon defendants' actions that are not time-barred.

### C. Equal Protection Claim

Since a class of one is likely to be the most vulnerable of all, the equal protection clause does not require that the plaintiff be a member of a class for "[i]f the power of government is brought to bear on a harmless individual merely because a powerful state or local official harbors a malignant animosity toward him, the individual ought to have a remedy in federal court." *Esmail v. Macrane*, 53 F.3d 176, 179-80 (7th Cir. 1995). Thus, absent a fundamental right or a suspect class, to demonstrate a viable claim in the land-use context, the plaintiff must demonstrate "governmental action wholly impossible to relate to legitimate governmental objectives." *Forseth v. Village of Suffex*, 199 F.3d 363, 371 (7th Cir. 2000) (quoting *Esmail*, 53 F.3d at 180; *Hager v. City of West Peoria*,

84 F.3d 865, 872 (7th Cir. 1996)). This standard can be satisfied with an equal protection claim based upon: (1) the malicious conduct of a governmental agent that evidences a spiteful effort to "get" the plaintiff for reasons wholly unrelated to any legitimate state objective, or (2) circumstances that suggest the plaintiff is not raising a takings claim under an equal protection disguise, such as a prayer for equitable relief where the plaintiff's claim that would evaporate if the municipality treated everyone equally. *Forseth*, 199 F.3d at 371.

Plaintiffs have disavowed any takings claim. They are not seeking just compensation for the taking of the Hawthorne, but rather damages stemming from defendant's conduct surrounding the "forced sale" of the Hawthorne. The issue then becomes whether plaintiffs have pleaded sufficiently an equal protection claim based upon an alleged spiteful effort by defendants to "get" them.

Defendants argue that plaintiffs have failed to allege the motivation to take their property was based on spite, an effort to "get" them, or some other totally illegitimate animus. (Mot. Dismiss at 10.) Plaintiffs counter by arguing that defendants discriminated against Edith because of her gender. (Pls.' Resp. Mot. Dismiss at 3.)

First, even the most liberal reading of plaintiffs' Complaint cannot sustain their gender discrimination claim. Nowhere in the Complaint is it alleged that defendants discriminated against Edith because of her gender. Thus, plaintiffs have not properly alleged gender discrimination. However, they have alleged defendants were maliciously out to get them. (Compl. ¶¶ 47, 48.)

According to the Seventh Circuit, for a plaintiff to allege sufficiently a "vindictive action" equal protection claim, she must simply allege that she was treated differently

19

and that the defendant's actions were irrational, arbitrary, and even vindictive. *Village of Willowbrook v. Olech*, 160 F.3d 386, 388 (7th Cir. 1998). In this case plaintiffs have alleged that defendants were "obstreperous and outright harassing with potential purchasers of the Hawthorne." (Compl. ¶ 36.) They further alleged that defendants acted intentionally and maliciously in allowing other similarly situated rooming houses to continue to operate without separate washrooms in each unit, while closing down the Hawthorne for that very condition. (*Id.* ¶ 47(e).) Finally, plaintiffs allege that defendants acted "with an evil motive and intent and with reckless indifference to [plaintiffs'] rights." (*Id.* ¶ 48.)

In *Forseth*, the plaintiffs had purchased land with the intention of developing it as a residential subdivision. 199 F.3d at 365. Before the plaintiffs could begin developing the land, they had to get approval from the village board. *Id.* at 366. The plaintiffs alleged that the board president, who lived near the proposed development, became angered and frustrated at the prospect of living near the development. *Id.* The board president "calculated a plan of harassment ... designed to exact retaliation and vengeance" upon the plaintiffs. *Id.* First, the board president claimed that the land was a Native American campground with archeological and historical significance. *Id.* Then he brought in the Army Corps of Engineers to have some of the plaintiffs' property declared protective wetland. In order for the board president to approve the planned development, the plaintiffs were forced to give him a "coveted piece of land [that the president] was unable or unwilling to fairly acquire." *Id.* The plaintiffs alleged that the president maliciously acted under color of state law with the intent to injure the plaintiffs. *Id.* at 367. The Seventh Circuit found that the plaintiff adequately had stated an equal

protection claim based upon the defendants' alleged act of conditioning approval of the plaintiffs' plan on their agreement to convey a piece of land to the board president as well as other acts that disrupted the proposed development. *Id.* at 370.

Like the plaintiffs in *Forseth*, plaintiffs allege that defendants maliciously caused the forced sale of their property. Thus, at this stage they have properly alleged an equal protection claim based upon defendants' intent to "get" them.[7]

### D.     Substantive and Procedural Due Process Claims

Plaintiffs allege that defendants' actions violated their substantive and procedural due process rights under the Fifth and Fourteenth Amendments. (Compl. ¶ 47.) Defendants argue that plaintiffs' claims must be dismissed because they must first seek redress for their injuries utilizing available state court remedies. (Mot. Dismiss at 8.)

The Supreme Court in *Williamson County Reg. Planning Comm'n v. Hamilton Bank* articulated a special ripeness doctrine for constitutional property rights claims which precluded federal courts from adjudicating land use disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive decision, and (2) the property owner exhausts available state remedies for compensation. *Forseth*, 199 F.3d at 368. (citing *Williamson County*, 473 U.S. at 193-94). A property owner cannot avoid *Williamson County* by applying the label "substantive due process" or "procedural

---

[7] Defendants argue that Scott and Anthony Kebleris should be dismissed from this action because there are no allegations of any "wrong" done to them or any rights that have been violated by defendants. (Mot. Dismiss at 7.) Plaintiffs allege that defendants refused to buy the Hawthorne unless both Scott and Anthony sold their property to them at a non-negotiable price. (Compl. ¶ 40.) It is reasonable to infer that both Scott and Anthony were pulled into the forced sale of the Hawthorne against their will. Thus, plaintiffs have stated a claim as to both Scott and Anthony.

due process" to the claim. *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 167 (7th Cir. 1994). A person contending that state or local regulation of the use of land has gone overboard must repair to state court. *River Park, Inc.*, 23 F.3d at 167. Even when a plaintiff claims that a state takes property for a purely private use, the plaintiff must still first avail herself of state court remedies. *Forseth*, 199 F.3d at 369-70. No Seventh Circuit case has excused any substantive due process claim from the *Williamson County* ripeness requirement in the land-use context. *Forseth*, 199 F.3d at 369.

Plaintiffs will not force this Court to address difficult questions regarding substantive due process by waiving a seemingly straightforward claim under the takings clause and stating a claim under equal protection.[8] *See Coniston Corp v. Village of Hoffman Estates*, 844 F.2d 461, 466 (7th Cir. 1988); *see also New Burnham, Inc. v. Village of Burham*, 910 F.2d 1474, 1480-81 (7th Cir. 1990) (dismissing the plaintiffs' procedural and substantive due process claims because the plaintiffs had not sought available state court remedies or shown that those remedies were inadequate). Because plaintiffs have not sought any remedies in state court for the alleged due process violations committed by defendants, their due process claims are not yet ripe for adjudication. Since this Court has no jurisdiction to hear those claims, they are dismissed without prejudice.

---

[8] It must be acknowledged that the Supreme Court has yet to set the contours of any substantive due process right with respect to property interests. *New Burnham, Inc*, 910 F.2d at 1481 n.5 (citing *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 263 (1977)).

### III. Section 1985 Claim

Defendants argue that plaintiffs' section 1985 claim should be dismissed because plaintiffs (1) fail to maintain a viable action for due process; (2) are not members of a suspect class subjected to invidious discriminatory animus; (3) have not alleged facts to support an agreement between defendants toward an unconstitutional action; and (4) because their claim is barred by the intra-corporate conspiracy doctrine. (Mot. Dismiss at 10.)

A claim for conspiracy under section 1985 requires: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws or equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *United Bhd. of Carpenters & Joiners, Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983). Furthermore, section 1985 requires not only an allegation of a conspiracy but also "some racial or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions. *Hernandez v. City of Chicago*, No. 99 C 6441, 2001 U.S. Dist. LEXIS 1217, at *29 (N.D. Ill. Feb. 9, 2001) (citing *Bowman v. City of Franklin*, 980 F.2d 1104, 1108 (7th Cir. 1993)). Plaintiffs have failed to state a cause of action under section 1985.

Defendants argue that the intra-corporation conspiracy doctrine bars plaintiffs' section 1985 claim. A conspiracy requires the cooperation of two or more persons. The intra-corporate conspiracy doctrine bar applies when employees of the same municipality act to harm an individual because their acts are viewed as being committed by one

person, namely the municipality, and thus there is no conspiracy. *See Wright v. Illinois Dept. Children & Family Servs.*, 40 F.3d 1492, 1508 (7th Cir. 1994). Section 1985 liability requires multiple actors, not multiple acts of discrimination or retaliation. *Travis v. Gray Comm. Mental Health Ctr.*, 921 F.2d 108, 111 (7th Cir. 1990). Plaintiffs have alleged that officials of the Town of Cicero conspired with *unknown others* to take their property, but they have not alleged that the *unknown others* are agents of the Town. (Compl. ¶¶ 15, 50.) However, since all that is required of plaintiffs at this stage is a short and plain statement and all reasonable inferences are to be drawn in favor of plaintiffs, plaintiffs have adequately alleged a conspiracy under section 1985(3). *See also Wolf v. City of Chicago Heights*, 828 F. Supp. 520, 524 (N.D. Ill. 1993) (finding that the plaintiff had properly pleaded a conspiracy between city officials and unknown others).

Plaintiffs have not alleged any racial or other class-based, invidious discrimination behind defendants' actions. The Seventh Circuit has proceeded cautiously in determining what types of class-based animi other than racial discrimination may provide a cause of action under 1985(3). *Jordan*, 505 F. Supp. 1, 3 (7th Cir. 1980). The only class plaintiffs could belong to would be the class of landowners in Cicero who own property near the racetracks. While the "class of one" may qualify under a section 1983 equal protection claim, plaintiffs fail to cite, and this Court fails to find, any case stating that such a class qualifies for protection under section 1985. Though plaintiffs have properly alleged a conspiracy under section 1985 between defendants and unknown individuals, they have not alleged that the conspiracy was based upon any racial or other class-based animi. Thus, they have not stated a claim under section 1985. *See Wilson v.*

*Giesen*, 956 F.2d 738, 744 (7th Cir. 1992); *Jordan*, 505 F. Supp. at 3; *Hernandez*, No. 99 C 6441, 2001 U.S. Dist. LEXIS 1217, at *29 (dismissing section 1985(3) claims for plaintiffs' failure to allege defendants conspired against them because of their race or because they were members of a class that shares common characteristics such as ethnicity, sex, or religion). Accordingly, plaintiffs' section 1985 claim is dismissed without prejudice.


## IV.    Plaintiffs' Claim for a Declaratory Judgment

In their first count, plaintiffs seek a declaration that defendants violated their rights when they refused to issue Edith a license for the operation of the Hawthorne and summarily closed the Hawthorne despite the grandfather lease. (Compl. ¶ 42.) Since these acts are time-barred, plaintiffs' request for a declaratory judgment is denied as to those acts.

However, plaintiffs also seek a declaration that defendants' interference with their attempts to sell the Hawthorne was a violation of their rights. (*Id.* ¶ 46.) Since the sale to Mr. Diaz in 1999 is not time-barred, the next issue is whether it would be appropriate for this Court to issue a declaratory judgment as to that act.

It is within this Court's discretion whether or not to grant declaratory relief. *See Brillhart v. Excess Ins. Co.*, 316 U.S. 491, 494 (1942). The primary purpose of a declaratory judgment is to avoid accrual of avoidable damages to one not certain of her rights and to afford her an early adjudication without waiting until her adversary should see fit to bring suit, after damage has accrued. *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1166 (7th Cir. 1969).

First, plaintiffs have not brought this case pursuant to 28 U.S.C. § 2201, nor is any reference made to that statute anywhere in their Complaint. Furthermore, in this case the damage has already been done. Plaintiffs have already alleged that they were not able to sell the Hawthorne to prospective buyers and were forced to sell it to defendants. Plaintiffs have failed to show how a declaratory judgment action would "effectuate the purposes of the statute and thereby afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations," or, in other words, what purpose a declaratory judgment would serve in this case. *Cunningham Bros.*, 407 F.2d at 1166 (quoting *Sears, Roebuck & Co. v. American Mut. Liability Co.*, 372 F.2d 435, 438 (7th Cir. 1967)). Moreover, plaintiffs seem to be attempting to try issues that are more appropriately suited for an action at law, which they have also requested via a trial by jury. To allow a declaratory judgment action would be to allow a substitute for the traditional procedures of adjudicating civil rights actions. *See id.* Since granting a declaratory judgment will not stop the accrual of any more harm to plaintiffs and because they have not explained how a declaratory judgment will benefit them or effectuate this litigation, this Court, exercises its discretion and declines to afford declaratory relief in this case.

## V.    State Law Claims

Plaintiffs bring a number of supplemental state law tort claims along with their federal claims, including tortious interference with prospective economic advantage (Count III), tortious interference with contractual relations (Count IV), common law

conspiracy (Count V), and violations of equal protection and due process under the Illinois Constitution (Count VI).

## A. Illinois Statute of Limitations for Tort Claims

Defendants argue that these claims are barred by Illinois Local Government and Governmental Employees Tort Immunity Act ("Tort Immunity Act") statute of limitations under 745 Ill. Comp. Stat. 10/8-101.[9] (Mot. Dismiss at 13.) Plaintiffs argue that the continuing violation doctrine under Illinois law applies, which states that "where a tort involves a continuing or repeated injury, the statute of limitations does not begin to run until the date of the last injury or when the tortious acts cease. *City of Rock Falls v. Chicago Title & Trust Co.,* 13 Ill. App. 3d 359, 364, 300 N.E.2d 331, 334 (3rd Dist. 1973).

While a state's statute of limitation applies to some claims brought in federal court, *Wolf,* 828 F. Supp. at 522; *Dixon v. Charns,* 986 F.2d 201, 203 (7th Cir. 1993), federal law determines the accrual of such claims. *Wilson,* 956 F.2d at 740. Thus, the Illinois continuing violation doctrine is not applicable here, and, as previously stated, any claims based upon acts occurring before February 28, 1999, are now time-barred.

However, the issue in this case becomes which Illinois statute of limitations applies to supplemental state law claims that plaintiffs have brought with their civil rights claims: the two-year statute of limitations for personal injury claims which applies to civil rights claims, 735 Ill. Comp. Stat. 5/13-202, or the one-year statute of limitations

---

[9] 745 Ill. Comp. Stat. 10/8-101 reads: "No civil action may be commenced in any court against a local entity or any of its employees for any injury unless it is commenced *within one year* from the date that the injury was received or the cause of action accrued."

found in the Tort Immunity Act, which applies to civil actions brought against local governments or local governmental employees. 745 Ill. Comp. Stat. 10/8-101.

Illinois courts have recognized that the Tort Immunity Act's time limit cannot be applied in section 1983 *litigation* (emphasis added). *Palmer v. Board of Education Comm. Unit School Dist.*, 46 F.3d 682, 684 (7th Cir. 1995) (citing *Weiss*, 588 N.E.2d at 436-38). There can only be one section 1983 statute of limitations per state-the general law applicable to personal injuries, and not special law applicable to subsets of personal injuries. *Palmer*, 46 F.3d at 684 (citing *Owens v. Okure*, 488 U.S. 235 (1989)). States are not free to endow themselves and their employees with special protection from section 1983 suits, which after all apply only to state actors. *Palmer*, 46 F.3d at 684. "The idea behind *Owens* and *Wilson* is to apply to the states the same periods of limitation that they deem satisfactory for private suits within their borders." *Id.* While these cases establish the applicable statute of limitations for section 1983 claims, they do not answer whether supplemental state law claims that would be barred in state court survive if joined in section 1983 litigation. To allow these claims to survive, however, would seemingly run against the period of limitations that Illinois "deems satisfactory," and thus not follow the purpose of *Owens* and *Wilson*.

In *Weiss v. Downers Grove*, the plaintiff brought a three-count complaint alleging negligence, willful and wanton conduct, and a section 1983 violation against the village of Downers Grove in Illinois state court. 225 Ill. App. 3d 466, 467-68, 588 N.E.2d 435, 435-36 (2d Dist. 1992). The trial court applied the one-year time limit under the Tort Immunity Act and dismissed the complaint. *Id.* at 436. On appeal, the appellate court reversed the trial court as to the dismissal of the section 1983 claim because the two-year

time limit for personal injuries under Illinois law should have been applied. *Id.* at 438-39. However, the appellate court affirmed the dismissal of the negligence and willful and wanton claims as time-barred, even though they were brought with the section 1983 claim. *Id.* Based on this, it seems that the two-year limit applies only to the section 1983 claim itself, and not to any state law claims brought with it.

Thus, applying the Tort Immunity Act's one-year time limit, the only act that is not time-barred is the alleged force sale of the Hawthorne in March 2000. Since plaintiffs' tortious interference claims (Counts III and IV) are based upon failed sales to prospective buyers of the Hawthorne in 1996 and 1999, those claims are time-barred. This leaves only plaintiffs' claims for conspiracy (Count V) and violations of equal protection and due process under the Illinois State Constitution (Count VI).

## B. Plaintiffs Failure to State Claims Under the Exception to the Tort Immunity Act

Defendants argue that they are absolutely immune from suit pursuant to numerous other sections of the Tort Immunity Act.[10] (Mot. Dismiss at 11, 12.) Plaintiffs contend that the provisions of the Tort Immunity Act do not apply when the local government and its officials act maliciously, wantonly, or with an evil motive. (Pls.' Resp. Mot. Dismiss at 11, 12.) Plaintiffs point to separate paragraphs in their Complaint to show that they have properly alleged that defendants acted maliciously, wantonly, or with an evil motive. (*Id.* (citing ¶¶ 67, 68, 72, 73.))

Mere conclusory allegations are insufficient to overcome the Tort Immunity Act's grant of immunity to public entities and employees. *Youker v. Schoenberger*, 22 F.3d

---

[10] This act encompasses 745 Ill. Comp. Stat. 10/1-101 through 10/10-101.

163, 168 (7th Cir. 1994) (quoting *Midamerica Trust Co. v. Moffatt*, 511 N.E.2d 964, 970 (Ill. App. Ct. 1987)). The mere insertion of the word "malicious" in a complaint cannot serve to transform an ordinary tort claim into an action for willful, wanton, and malicious conduct. *Youker*, 22 F.3d at 168 (holding that the plaintiff failed to plead properly malicious conduct when he alleged that the defendants "maliciously discharged plaintiff from his employment in violation of state and federal public policy). The plaintiff must plead in detail specific facts showing bad faith and improper motive. *Id.* (quoting *Koeing v. Board of Educ. for Elementary Sch. Dist. 102*, 1993 U.S. Dist. LEXIS 17967, at *10; *Midamerica*, 511 N.E. 2d at 970).

Paragraphs 68, 72, and 73 in the Complaint are merely conclusory allegations that will not overcome the immunity granted to defendants under the Tort Immunity Act. In paragraph 68, plaintiffs allege: "Defendants acted with evil motive and intent and with reckless indifference to Kebleris' rights." In paragraph 72, they allege: "The conduct of Defendant was an abuse of government power and done with malice and gross negligence, and in knowing violation of and/or reckless deliberate indifference to constitutional rights of Edith." Finally, in paragraph 73 they allege: "Defendant acted with evil motive and intent and with reckless indifference to Edith's rights"). As the Seventh Circuit explained in *Yonker*, such conclusory statements, without more, will not suffice.

Paragraph 67 does detail how defendants "maliciously enforced in an unlawful fashion the building codes and ordinances of Defendant Cicero . . . ." However, as stated earlier, the enforcement of the "new ordinance" in October 1998 is a time-barred act. Thus, that "malicious" conduct is not actionable. Plaintiffs also allege that defendants'

malicious conduct extended to their "refusing to purchase the Hawthorne property unless Scott and Anthony also sold their property . . . ." (Compl. ¶ 67(d).) However, plaintiffs have not alleged why this act was malicious or how defendants acted maliciously. All of the "malicious" acts in the Complaint are either barred by the Tort Immunity Act's statute of limitations or not specific enough to survive the standard set forth in *Midamerica*. Therefore, the Court grants defendant's motion to dismiss plaintiffs' state law claims for conspiracy (Count V) and equal protection and due process under the Illinois Constitution (Count VI) and those claims are dismissed without prejudice.

### Conclusion

For the foregoing reasons, the Court grants in part and denies in part defendants' Motion to Dismiss [docket no. 7-1]. With regard to Count I, the Motion to Dismiss is granted without prejudice as to plaintiffs' substantive and procedural due process claims and denied as to plaintiffs' equal protection claim. Further, the Court grants defendant's Motion to Dismiss as to Counts II through IV and plaintiffs' request for declaratory judgment relief. Counts III and IV, which are based upon time-barred acts, are dismissed with prejudice. Counts II, V, and VI are dismisses without prejudice. Thus, only plaintiffs' section 1983 claim based upon equal protection remains.

**SO ORDERED:**                                    **ENTER.** 12/14/01

                                                   _Ronald A. Guzman_
                                                   **HON. RONALD A. GUZMAN**
                                                   **United States Judge**